**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION**

| | | |
|---|---|---|
| THE ESTATE OF DANIEL D. CODDINGTON, by and through Personal Representative Lisa M. Coddington, | ) ) ) ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 5:21-CT-3020-BO |
| v. | ) | |
| | ) | |
| UNITED STATES OF AMERICA, SUSAN GILL, ASHLEY EDDINS, EDAVALLY REDDY, OFFICER VERONIQUE BROOKS, OFFICER ERIC BILES, AND UNKNOWN OFFICERS, | ) ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

**FIRST AMENDED COMPLAINT**

Plaintiff Lisa M. Coddington, as the personal representative of the Estate of Daniel D. Coddington, by and through her undersigned counsel, brings this Complaint against the United States of America ("United States") pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671, et seq., 28 U.S.C. § 1346(b)(1), against Edavally Reddy, MD for violations of North Carolina law and the Eighth Amendment to the Constitution of the United States of America, and against Susan Gill, Officer Veronique Brooks, Ashley Eddins, Officer Eric Biles, and Unknown Officers[1] in their individual capacities, pursuant to *Bivens v. Six Unknown Named Agents of*

---

[1] Upon information and belief, there are several unknown officers who were BOP officers, employees, or contractors, whose wrongful acts, neglect, default, and wanton disregard for Daniel's life resulted in his death. An unknown portion of these individuals may be Caleb Meyer or one or

1

*Federal Bureau of Narcotics*, 403 U.S. 388 (1971), under the Eighth Amendment to the Constitution of the United States of America.

## INTRODUCTION AND SUMMARY OF ACTION

1. This is a wrongful death, survival, civil rights, and medical malpractice action asserting willful, reckless, and wanton negligence in connection with actions and/or omissions of the United States, individual medical providers Caleb Meyer, Susan Gill, Ashley Eddins, Dr. Reddy, and prison officers and employees, including Officers Brooks and Biles as well as Unknown Officers, (collectively "Defendants"), leading to the death of Daniel D. Coddington.

2. Daniel was a dedicated husband, father, grandfather of ten, son, brother, and friend. Daniel worked as a teacher and coach for many years. He later worked in real estate and land development.

3. Daniel surrendered to the Low Security Correctional Institution in Butner, North Carolina[2] on January 8, 2019. At Butner's direction, he brought his medication with him with specific written instructions. Upon arrival, however, medical staff discarded his medication, ignored the instructions, and proceeded to improperly administer the wrong medication at the wrong frequency, which resulted in Daniel's pain and suffering and, ultimately, his foreseeable and preventable death just nine days later.

---

more of the individual Defendants, Dr. Reddy, Susan Gill, Ashley Eddins, Officer Brooks, or Officer Biles. Until discovery is completed, any actions or omissions attributed to the Unknown Officer Defendants are properly attributable to any of the named individual Defendants, Caleb Meyer, or an agent of the United States, where appropriate, when viewing the Complaint in a light most favorable to the Plaintiff.

[2] We use the term "Butner" throughout this Complaint to refer to the complex of BOP facilities, including FMC Butner, Butner Low, FCI Butner Medium, and FCI Butner Medium II.

4. On January 16, 2019, the day before he died, numerous fellow inmates continuously alerted prison staff of Daniel's rapidly deteriorating physical condition. Daniel suffered from at least two seizures and could not stand up without the assistance of fellow inmates. The staff were aware of the reports of multiple seizures, severe abdominal pain, inability to control his bladder, and intractable vomiting, yet no physician examined Daniel. Instead, his seeking help for his worsening condition was considered "malingering type behavior," and he was subjected to intimidation and threats and sent back to his cell, where he eventually suffered from multiple episodes of syncope (loss of consciousness), became unresponsive, lapsed into agonal breathing, and was left to die without medical treatment.

5. Even though Defendants knew of Daniel's serious medical conditions, had all of his medical records which documented these conditions in detail, and had access to medication to treat these serious medical conditions, and despite witnessing his serious acute symptoms, Defendants met Daniel's pleas for help with threats, including solitary confinement, if he sought further medical help, deliberate indifference to his obvious pain and suffering, and inadequate medical care. Daniel died early on the morning of January 17, 2019, after only nine days at Butner.

6. But for Defendants' wrongful acts, neglect, default, and wanton disregard for his life, Daniel would have survived.

## JURISDICTION AND VENUE

7. This action is brought pursuant to the FTCA, 28 U.S.C. § 2671, et seq., 28 U.S.C. § 1346(b)(1), N.C.G.S.A. § 28A-18-2, N.C.G.S.A. § 90-21.11, et seq., and the Eighth Amendment to the Constitution of the United States of America.

8. This Court has jurisdiction under 28 U.S.C. § 1331.

3

9. This Court also has exclusive jurisdiction over the FTCA claims pursuant to 28 U.S.C. § 1346(b)(1), because Lisa, as personal representative of Daniel's estate, alleges "claims against the United States, for money damages, accruing on or after January 1, 1945, for injury or loss of property, or personal injury or death caused by the negligent and wrongful act and omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to [Plaintiff] in accordance with the law of the place where the act or omission occurred."

10. Further, this Court has supplemental jurisdiction over the medical malpractice claims pursuant to 28 U.S.C. § 1367, because "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy . . . ." The medical malpractice claims arise from the same case or controversy as the FTCA claims because they involve treatment by providers that resulted in Daniel's death. *See infra* ¶¶ 24-28.

11. On June 12, 2020, Lisa, through counsel, served written notice, specifically a Standard Form 95 together with an addendum and supporting documents, of her administrative tort claim to the Federal Bureau of Prisons ("BOP").

12. The Office of the Executive Assistant confirmed receipt via email on June 14, 2020.

13. On July 7, 2020, Plaintiff's counsel received acknowledgement of receipt of the administrative tort claim from Christina A. Kelly, Attorney, on behalf of Michael D. Frazier, Regional Counsel for BOP. The letter noted that the "claim has been accepted and will be considered for administrative settlement." It also explained that BOP "anticipate[d] six months

from the date of receipt of your claim, to review, consider, and adjudicate [Plaintiff's] claim."

14.  On July 31, 2020, Lisa's counsel sent a letter in response to remind BOP of its obligation to preserve relevant information and to request information about providers who appear in the decedent's medical records.[3]

15.  On August 5, 2020, Ms. Kelly responded with the requested information, confirmed BOP's ongoing obligation to preserve all relevant records and information, and sought additional information from Lisa's counsel.

16.  On September 7, 2020, Lisa's counsel responded with the requested information.

17.  On December 21, 2020, Lisa's counsel sent an email to Ms. Kelly noting that six months had come and gone with no disposition from BOP.  Ms. Kelly responded that same day stating that their review was not complete and acknowledged that "in accordance with section 2675(a), at this time you do have the option to deem your claim as denied."  On January 13, 2021, Lisa's counsel informed Ms. Kelly that Plaintiff planned to file a lawsuit and suggested that BOP administratively close their investigation as appropriate.  On January 14, 2021 BOP sent a letter denying the claim and stating that Lisa could file suit in the appropriate court.  *See* Exhibit A.

18.  Pursuant to 28 U.S.C. § 2675(a), Lisa not only deemed BOP's failure to make a final disposition of her claim within six months a denial, but she received confirmation of that denial by BOP on January 14, 2021.  Lisa has, therefore, exhausted administrative remedies pursuant to 28 U.S.C. § 2401(b).

19.  This Court has specific jurisdiction over all Defendants because all relevant acts

---

[3] On January 25, 2019, Daniel's defense counsel sent a letter to the Office of General Counsel for the BOP seeking the preservation of all relevant records and information following his death.

5

and omissions occurred within the Eastern District of North Carolina.

20.     Venue for this action is properly laid in the Eastern District of North Carolina pursuant to and in accordance with 28 U.S.C. § 1391 and 18 U.S.C. § 1402(b) because the events giving rise to Lisa's claims occurred in this District.

## PARTIES

21.     Lisa M. Coddington, personal representative of the estate of Daniel D. Coddington, is a resident of the state of Colorado and a United States citizen.

22.      Lisa is the wife of the decedent and the personal representative of the decedent's estate.  *See In the Matter of the Estate of Daniel Dirk Coddington*, 20E164, attached hereto as Exhibit B.

23.     Decedent Daniel D. Coddington was confined at Butner at the time of his death.

24.     Defendant United States of America is sued under the Federal Tort Claims Act, 28 U.S.C. § 2671, et seq., and 28 U.S.C. § 1346, for the tortious acts and omissions of its employees and agents, including but not limited to Susan Gill, RN, Caleb Meyer, APRN-CNP, Ashley Eddins, RN, Officer Biles, Officer Brooks, and Unknown Officers.

25.     Caleb Meyer, APRN-CNP was an employee of the United States as a member of the United States Public Health Service and was assigned to BOP, specifically Butner.  Although not a named defendant, Caleb Meyer's actions and omissions are properly attributable to Defendant United States through the FTCA.

26.     Susan Gill, RN was employed by BOP, specifically Butner.

27.     Ashley Eddins, RN was employed by BOP, specifically Butner.

28.     Upon information and belief, Defendant Edavally Reddy, MD was a private

6

physician, employed through Butner's contract with ZSN Care, LLC, a contractor of the University of Massachusetts Medical School.

29.     Defendants Eric Biles and Veronique Brooks are officers and employees who, upon information and belief, were employed by BOP, specifically Butner.

30.     Defendants Unknown Officers are officers, employees, and contractors who, upon information and belief, were employed by BOP, specifically Butner, or a contractor thereof.

**FACTUAL ALLEGATIONS**

31.     Daniel D. Coddington was an active member of his community as well as a dedicated husband, father, grandfather, son, brother, and friend.  He worked as a teacher and coach for many years.  Eventually, he transitioned into real estate and land development.  His children and stepchildren, whom he also helped raise, describe him as a good and dedicated father.  His wife, Lisa, describes him as a wonderful partner and friend.  When Daniel faced trial, sentencing, and incarceration, his family and friends stood by his side throughout the entire process.  Defense counsel appealed Daniel's conviction, and his conviction was ultimately vacated because of his death.

32.     Prior to his incarceration for wire fraud and securities fraud, Daniel had a serious but manageable medical regimen prescribed and monitored by the Mayo Clinic in Rochester, Minnesota.  Daniel's condition had been stable for several years prior to his death.  Due to the longstanding preexisting relationship between the Mayo Clinic and Daniel, in Daniel's sentencing memorandum and at his sentencing hearing, defense counsel argued vigorously for probation, or alternatively for a recommendation that he be incarcerated at the federal medical complex in Rochester, Minnesota if the court was going to impose a prison sentence.  Citing past audits

conducted by BOP's Office of Inspector General, defense counsel argued that Daniel would not otherwise be able to obtain the type of medical care he needed "to remain stable, or stay alive, in the Bureau of Prisons." In response at the sentencing hearing, the prosecutor claimed that the audit data was "outdated" and "not relevant" to the current situation at BOP. Also, at the sentencing hearing, the prosecutor argued that defense counsel simply had "no evidence before the court that he can't be adequately cared for." The presiding judge announced that Daniel "needs medical care," and "deserves to have it," and recommended incarceration at the federal medical complex in Rochester, Minnesota. BOP ignored this recommendation. Daniel was designated, instead, to Butner.

33. The COVID-19 pandemic further exposed Butner's grave inability to care for its inmates. As of October 26, 2020, twenty-six people at Butner, including one correctional officer, have died from COVID-19—twice as many deaths as any other BOP facility in the nation and one-fifth of all deaths in BOP facilities. *Hallinan et al v. Scarantio et al*, Pet. for Writ of Habeas Corpus Under 28 U.S.C. § 2241 and Class Action Compl. for Inj. and Declaratory Relief at 21., No. 20-02088 (E.D.N.C. May 26, 2020). The ACLU filed suit in which it described the shocking conditions at Butner, which included minimal sanitation, limited access to personal hygiene, and even limited access to medical care despite Butner serving as a federal medical center. *See generally id.*

34. Immediately after his sentencing, Daniel's defense counsel filed for a stay of execution of Daniel's sentence in the Tenth Circuit based on the designation to Butner. The Tenth Circuit denied the request. In response, over the next several weeks, defense counsel did everything possible to change his designation, including repeatedly calling BOP, sending follow-

8

up emails, and resending Daniel's medical paperwork to authorities at BOP.

35.     Daniel's defense counsel was also in frequent contact with BOP and Butner about what Daniel needed to bring with him to ensure he received the care he needed.  When defense counsel was able to connect with someone at Butner, upon information and belief, a nurse advised her that Butner was aware of Daniel's medical condition, Butner was in receipt of his medical records, and he needed to bring two weeks' worth of medication with him.  Upon information and belief, a nurse at Butner, and others at BOP, informed defense counsel and her assistant several times that there was no need to get specific medications approved.

36.     Daniel surrendered to Butner on January 8, 2019, accompanied by Lisa and two of his children, D. Scott Coddington and Sarah Jane Jones.  Lisa brought a month's worth of new and sealed medication for Daniel, despite the fact that Butner reported to defense counsel that he only needed two weeks' worth of medication.  She also provided detailed written instructions in the plastic bags containing the medication regarding how the medication should be administered.

37.     Unfortunately, Daniel's specialized medications and detailed instructions were immediately discarded and ignored.  In contrast to what Butner reported to defense counsel, some medications and treatments were wholly eliminated, while others were replaced with inappropriate alternatives in terms of dosage/frequency and were incorrectly administered.  Provider Caleb Meyer, APRN-CNP made these changes and Dr. Reddy co-signed the new medication orders. They were or should have been aware of Daniel's chronic medical conditions as well as the proper frequency, route, and dosages for the medications he was taking and the medications they ordered for him.

38.     On January 11, 2019, Provider Meyer and Dr. Reddy performed a physical

9

examination of Daniel. Daniel was told, as noted in his BOP medical records signed by Provider Meyer and Dr. Reddy, to "Return Immediately if Condition Worsens."

39. In the days that followed, Daniel's health began to worsen. Just seven days later, on January 15, 2019, Daniel was evaluated by Provider Ha, Micky Pharm. D., for complaints of pain. Provider Ha recommended a medication review. Dr. Reddy co-signed the encounter.[4]

40. The next day, Daniel's condition—which was clearly critical and life-threatening—sharply declined and was ignored by Defendants. Upon information and belief, around 1:30 p.m., Daniel had a seizure and passed out, which was witnessed by his fellow inmates. Daniel was transported to the medical center via wheelchair, pushed by medical staff. He was seen by Providers Meyer, APRN-CNP, and Eddins, RN, around 2:30 p.m. They were aware of Daniel's medical condition. Daniel told Provider Eddins: "I was standing and felt dizzy, so I sat on my bed and I don't remember anything else. The officers were holding me up and I was sweating." They merely administered Daniel one liter of intravenous fluid and released him from the medical center in a wheelchair. Dr. Reddy co-signed the encounter. Upon information and belief, Dr. Reddy did not examine Daniel and did not transfer Daniel for further diagnostic testing and work-up.

41. When Daniel returned to his unit, he had another witnessed seizure. Daniel alerted the officer, who called the medical center. Provider Gill, RN arrived at his unit around 4:45 p.m. She refused to take him to the medical center. Daniel was sent to the dining room in a wheelchair and then back to the medical center afterwards. Upon information and belief, Officer Biles, who

---

[4] Upon information and belief, Dr. Reddy co-signed or approved all encounters between Provider Caleb Meyer and Daniel. Upon information and belief, Provider Caleb Meyer co-signed or approved all encounters between Provider Susan Gill, Provider Ashley Eddins, and Daniel. Upon information and belief, Dr. Reddy as the physician had ultimate approval over the encounters co-signed or approved by Provider Caleb Meyer.

was aware of Daniel's deteriorating condition, told Daniel that any further visits to the medical center for this complaint would result in him being moved to the Special Housing Unit. The Special Housing Unit is a punitive measure, often referred to as the SHU, solitary confinement, or the segregated or secure housing unit.

42.     Daniel spoke to Lisa through the prison telephone around 6:30 p.m. Daniel told her that he was very ill, reported his symptoms—including that he was vomiting, nauseous and dizzy—and shared his concerns that he was not getting the medical attention he needed from the infirmary, or any nurse or doctor. Daniel also told Lisa that he was threatened to be put in the SHU if he went back to the medical clinic. He told her that he was terrified of dying in the SHU. Daniel also expressed this fear to at least two other inmates.

43.     When Daniel returned from the medical center, he had to be assisted from his wheelchair to his bunk. He tried to stand and fell. His fellow inmates informed Officer Brooks of Daniel's condition and called the medical center. The personnel at the medical center refused to respond to the unit.

44.     Several inmates helped Daniel from the floor to his wheelchair. Fellow inmates, concerned about Daniel's ever-worsening condition and receiving no help from the Unknown Officer Defendants, transferred Daniel to the medical center around 6:50 p.m., where he again encountered Provider Susan Gill, RN. Daniel was seen again by Provider Gill at or around 6:55 p.m. Provider Gill documented Daniel's continued complaints of dizziness. She did not record any detailed findings from any physical examination. Daniel's blood pressure remained below normal. According to the medication administration record, despite the reports of dizziness, seizures and Daniel's hypotension, Nurse Gill administered an injection of 120 mg of Enoxaparin

11

at 6:55 p.m., which is a blood thinner, without checking with any physician to verify if this was safe given Daniel's concerning presentation. Nurse Gill documented that Daniel was "counseled on malingering type behavior by custody staff and medical staff." Provider Meyer co-signed the encounter, and upon information and belief, it was ultimately approved by Dr. Reddy. Daniel was again told, by Unknown Officers, that if he sought further medical help he would be placed in solitary confinement.

45.     Once back in his bunk, Daniel vomited. Inmates helped care for him and clean the unit.

46.     Daniel was unable to stand for the 9:00 p.m. inmate count. Officer Brooks and an Unknown Officer noted this but did not take any action.

47.     Daniel continued to vomit. He was again urged to request medical help by his fellow inmates, but he refused, citing the threat of being sent to solitary confinement. During the night, Daniel lost consciousness several times and laid moaning in pain on his bunk.

48.     Before 3:00 a.m. on January 17, 2019, one of Daniel's fellow inmates approached the evening officer (Unknown Officer) and reported that Daniel was complaining of excruciating abdominal pain and appeared very ill. The inmate was told that the Unknown Officer had been briefed that Daniel was "causing trouble with medical" and refused to help.

49.     The Unknown Officer conducted the 3:00 a.m. inmate count but failed to check on Daniel despite being told that he was very ill and was experiencing severe abdominal pain. After another request was made, the Unknown Officer checked on Daniel and noted that he was unresponsive and had shallow breathing. The Unknown Officer called for a medical evaluation.

50.     After over 40 minutes had passed, Provider Andrew Comer, EMT-P arrived around

12

3:46 a.m. to find Daniel "lying in the bed facing the wall unresponsive to pain, and having agonal respirations." CPR was finally initiated and Daniel was transported to the medical center. Despite resuscitative efforts, including CPR, Daniel was pronounced dead at 4:16 a.m. on January 17, 2019.

51. An autopsy was performed. The conclusion by the Medical Examiner was that Daniel died from "complications of abdominal wall hemorrhages in the setting of chronic subcutaneous anticoagulant therapy for a clotting disorder of unknown etiology." The autopsy notes over two liters of liquid and clotted blood in Daniel's abdomen on the right. Daniel died from hypovolemic shock due to the large collection of blood within his abdominal wall tissues.

52. Daniel's death was easily avoidable. His condition was treatable.

53. All individual Defendants and Caleb Meyer knew of and disregarded a substantial risk to Daniel's health. Upon information and belief, all individual Defendants and Caleb Meyer conferred regarding Daniel and were aware that he was threatened with solitary confinement if he sought further medical care for his deteriorating condition, which so obviously mandated treatment that even a lay person would easily recognize the need for a doctor's attention.

54. Dr. Reddy and agents of Defendant United States had joint and several duties to provide timely and appropriate medication and medical care to inmates or obtain timely and appropriate medical care for inmates at Butner, including Daniel.

55. Dr. Reddy and agents of Defendant United States breached their respective duties to Daniel in their medication orders, the administration of the medication(s), and in their failure to timely transfer Daniel for his serious acute symptoms on January 16, 2019.

56. Dr. Reddy and medical staff at Butner, as agents of Defendant United States, did

13

not provide the requisite level of medical care that would be expected of reasonably prudent health care providers in the same or similar circumstances with regard to ordering medications, medical management, medication administration, and their response to his acute and serious symptoms on or about January 16, 2019. These acts and omissions by Dr. Reddy and employees of Defendant United States were a proximate cause of Daniel's extreme pain, suffering, and death.

57. Similarly, the failure of BOP officers or employees to obtain the necessary medical care for Daniel was a result of Defendants' deliberate indifference to his basic human needs.

58. Defendants' deliberate indifference to Daniel's serious medical needs caused him unnecessary, prolonged physical suffering, which amounted to cruel and unusual punishment, loss of liberty, fear, emotional distress, and, ultimately, death.

59. Daniel was a family man with a long list of survivors who have suffered greatly because of his death. He is survived by his wife, who has suffered the loss of love and affection as well as companionship, among other things. He is also survived by his mother and stepfather. He also has several children and stepchildren, who prematurely lost his love and parental guidance, among other things. He is also survived by ten grandchildren.

60. As a result of Defendants' wrongful conduct, Daniel's survivors have experienced extreme emotional distress as they have learned about his mistreatment, suffering, and ultimate death.

61. The medical care and all medical records pertaining to the alleged negligence that are available to the Plaintiff after reasonable inquiry have been reviewed by a person who is reasonably expected to qualify as an expert witness under Rule 702 of the Rules of Evidence, and who is willing to testify that the medical care did not comply with the applicable standard of care

14

and that said negligence proximately caused Daniel's pain, suffering, and death.

**FIRST CAUSE OF ACTION**
**Wrongful Death Pursuant to N.C.G.S.A. § 28A-18-2**
**(Against Defendants United States and Edavally Reddy)**

62. Plaintiff hereby incorporates by reference each of the preceding allegations as though fully set forth herein.

63. Dr. Reddy and Butner medical and nursing staff, officers, employees, agents, and contractors, while working on behalf of the United States, and acting within the course and scope of their duties, engaged in wrongful acts, neglect, or default when they improperly discarded Daniel's medications and written instructions, changed his medication orders, improperly administered the new medication both in terms of dose and frequency, administered a dose of Enoxaparin the evening before his death without checking with a physician when Daniel was clearly exhibiting concerning symptoms that needed immediate medical evaluation, repeatedly ignored his pleas for help, accused him of malingering, threatened him with solitary confinement when his health was failing, and failed to provide him with timely and appropriate medical care.

64. Defendants' unlawful conduct caused Daniel's pain, suffering, and death, and would have entitled Daniel to maintain an action for damages therefor, had he survived.

65. As a result of the unlawful conduct of Defendants, Daniel experienced severe pain, suffering, and ultimately death.

66. As a further result of the unlawful conduct, Plaintiff as well as Daniel's other survivors have suffered and continue to suffer mental anguish, loss of Daniel's society, companionship, comfort, guidance, kindly offices, and advice; Daniel's reasonable expected income; and Daniel's services, protection, care, and assistance.

15

## SECOND CAUSE OF ACTION
### Negligence/Personal Injury (Survival Action Pursuant to N.C.G.S.A. § 28A-18-1)
### (Against Defendants United States and Edavally Reddy)

67. Plaintiff hereby incorporates by reference each of the preceding allegations as though fully set forth herein.

68. Defendants United States and Dr. Reddy had a duty to provide Daniel with correct medications, administered correctly in terms of frequency and means of administration, as well as timely and appropriate medical care.

69. Defendants United States and Dr. Reddy breached their duty of care by failing to provide or denying Daniel access to appropriate and correctly administered medication and timely and appropriate medical care.

70. Such breaches by Dr. Reddy and the employees of Defendant United States were the proximate cause of Daniel's grave personal injuries and intense suffering prior to his death.

## THIRD CAUSE OF ACTION
### Intentional Infliction of Emotional Distress
### (Survival Action Pursuant to N.C.G.S.A. § 28A-18-1)
### (Against Defendant United States)

71. Plaintiff hereby incorporates by reference each of the preceding allegations as though fully set forth herein.

72. Plaintiff further alleges that Defendants' intentional and reckless conduct that caused Daniel's death was extreme and outrageous.

73. Defendants undertook these actions with intentional and reckless disregard of the substantial likelihood of causing severe emotional distress to Daniel.

74. As a result of Defendants' unlawful conduct, Daniel suffered severe emotional

16

distress before he died.

**FOURTH CAUSE OF ACTION**
**Negligent Infliction of Emotional Distress**
**(Survival Action Pursuant to N.C.G.S.A. § 28A-18-1)**
**(Against Defendant United States)**

75.     Plaintiff hereby incorporates by reference each of the preceding allegations as though fully set forth herein.

76.     Plaintiff further alleges that employees of Defendant United States, including Butner medical staff, officers, employees, and contractors, negligently engaged in conduct and intentionally chose not to act, causing Daniel severe emotional distress prior to his death.

77.     It was reasonably foreseeable that the conduct and omissions would cause Daniel severe emotional distress.

78.     As a result of the unlawful conduct and intentional failures to act of employees of Defendant United States, including Butner medical staff, officers, employees, and contractors, Daniel suffered severe emotional distress leading up to his death.  In addition, Plaintiff and Daniel's other survivors suffered and continue to endure severe emotional pain and suffering, resulting in damage to their well-being that persists to this day.

**FIFTH CAUSE OF ACTION**
**Violation of the Eighth Amendment to the**
**Constitution of the United States of**
**America**
**(Against Defendants Ashley Eddins, Susan**
**Gill, Officer Brooks, Officer Biles,**
**Edavally Reddy, and Unknown Officers)**

79.     Plaintiff hereby incorporates by reference each of the preceding allegations as though fully set forth herein.

17

80. Butner medical staff, officers, employees, and contractors' acts and omissions constituted a denial of Daniel's right to be free from cruel and unusual punishment in the form of inhumane treatment and unnecessary physical pain and suffering, constituting a violation of the Eighth Amendment to the Constitution of the United States of America.

81. The refusal of Caleb Meyer, Ashley Eddins, Susan Gill, Dr. Reddy, Officer Brooks, Officer Biles, and Unknown Officers to treat Daniel with adequate and timely medical care while they knew that he had suffered two witnessed seizures, was lying in retching pain on the floor, had intractable vomiting, and had lost control of his bladder due to a serious medical condition, combined with their threats of solitary confinement if Daniel sought necessary medical care, constitute deliberate indifference to a serious medical need that shocks the conscience and is intolerable to fundamental fairness.

82. Caleb Meyer, Ashley Eddins, Susan Gill, Dr. Reddy, Officer Brooks, Officer Biles, and Unknown Officers knew of and disregarded a substantial risk to Daniel's health, which so obviously mandated treatment that even a lay person would easily recognize the need for a doctor's attention.

83. This claim is against Ashley Eddins, Susan Gill, Officer Brooks, Officer Biles, and Unknown Officers in their individual capacities, pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971).

## DAMAGES

84. As a result of Defendants' unlawful conduct and omissions, Daniel died. His death, on January 17, 2019, injured Plaintiff and Daniel's other survivors.

85. As his wife and personal representative of the Estate of Daniel D. Coddington,

18

Plaintiff seeks damages pursuant to N.C.G.S.A. § 28A-18-2(b) to compensate for, *inter alia*:

    a.    Compensation for the pain and suffering of Daniel;

    b.    The reasonable funeral expenses for Daniel;

    c.    The present monetary value of Daniel to the persons entitled to receive the damages recovered, including but not limited to compensation for the loss of the reasonably expected:

        i.    Net income of Daniel;

        ii.    Services, protection, care and assistance of Daniel, whether voluntary or obligatory, to the persons entitled to the damages recovered;

        iii.    Society, companionship, comfort, guidance, kindly offices and advice of Daniel to the persons entitled to the damages recovered;

    d.    Such punitive damages as Daniel could have recovered pursuant to Chapter 1D of the General Statutes had he survived, and punitive damages for wrongfully causing the death of Daniel through malice or willful or wanton conduct, as defined in G.S. 1D-5; and

    e.    Nominal damages when the jury so finds.

86.    Plaintiff alternatively seeks damages pursuant to N.C.G.S.A. § 28A-18-1 to compensate for:

    f.    Pain, suffering, loss of dignity, mental anguish, inconvenience, loss of capacity for enjoyment of life, and discomfort Daniel experienced prior to

his death because of Defendants' negligent conduct.

g.  Emotional distress Daniel experienced prior to his death because of Defendants' intentional, willful, or, at a very minimum, negligent misconduct.

h.  Emotional distress Plaintiff and Daniel's other survivors suffered and continue to endure due to Daniel's death.

i.  All damages listed in N.C.G.S.A. § 28A-18-2(b).

87.  Plaintiff also seeks compensatory and punitive damages pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971) for the cruel and unusual punishment, in the form of inhumane treatment and unnecessary physical pain and suffering, he suffered in violation of the Eighth Amendment to the Constitution of the United States of America.

## **PRAYER FOR RELIEF**

WHEREFORE, for the reasons stated above, Plaintiff respectfully requests that the Court enter a judgment against Defendants:

1.  Awarding compensatory damages to Plaintiff in the amount of $20,000,000;

2.  Awarding damages recoverable under N.C.G.S.A. § 28A-18-2;

3.  Awarding Plaintiff's attorneys' fees and costs pursuant to federal and state laws, including 18 U.S.C. § 2412; and

4.  Order such other and further relief as the Court considers just and proper.

20

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury on all claims so triable in this case.

June 1, 2021

By: */s/ Amy Richardson*

Amy E. Richardson
NC State Bar Number: 28768
Harris, Wiltshire & Grannis LLP
1033 WADE AVE, SUITE 100
RALEIGH, NC 27605-1155
Telephone: (919) 504-9833
Facsimile: (202) 730-1301
arichardson@hwglaw.com

*Counsel for Plaintiff Lisa M. Coddington*

21

**CERTIFICATE OF SERVICE**

I hereby certify that on this 1st day of June 2021, I caused a true and correct copy of the

foregoing to be served via CM/ECF Notice of Electronic Filing to the following:

Christopher J. Blake
Special Assistant Attorney General for
Commonwealth of Massachusetts
NELSON MULLINS RILEY & SCARBOROUGH LLP
4140 Parklake Avenue
Suite 200
Raleigh, NC 27612
Telephone: (919) 329-3800
Facsimile: (919) 329-3799
chris.blake@nelsonmullins.com

Michael D. Bredenberg
U.S. Attorney's Office
150 Fayetteville Street
Suite 2100
Raleigh, NC 27601
Telephone: 919-856-4308
Facsimile: 919-856-4821
michael.bredenberg2@usdoj.gov

By: */s/ Amy Richardson*

Amy E. Richardson
NC State Bar Number: 28768
HARRIS, WILTSHIRE & GRANNIS LLP
1033 WADE AVE, SUITE 100
RALEIGH, NC 27605-1155
Telephone: (919) 504-9833
Facsimile: (202) 730-1301
arichardson@hwglaw.com

*Counsel for Plaintiff Lisa M. Coddington,
Personal Representative of the Estate of
Daniel D. Coddington*